Slip Op. 19-129

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CAN THO IMPORT-EXPORT JOINT STOCK COMPANY,** | |
| Plaintiff, | |
| v. | Before: Claire R. Kelly, Judge |
| **UNITED STATES,** | Court No. 16-00071 |
| Defendant, | PUBLIC VERSION |
| and | |
| **CATFISH FARMERS OF AMERICA ET AL.,** | |
| Defendant-Intervenors. | |

## OPINION AND ORDER

[Remanding the U.S. Department of Commerce's remand redetermination.]

Dated: October 17, 2019

Andrew Brehm Schroth, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Hong Kong, S.A.R., Andrew T. Schutz, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., and Jordan Charles Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, for plaintiff Can Tho Import-Export Joint Stock Company.

Kara Marie Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C, for defendant. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy. Of Counsel on the brief was Ian McInerney, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Jonathan Zielinski, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for defendant-intervenors Catfish Farmers of America; America's Catch; Alabama Catfish, Inc.; Heartland Catfish Company; Magnolia Processing, Inc. d/b/a Pride of the Pond; and Simmons Farm Raised Catfish, Inc.

Kelly, Judge:  Before the court is the United States Department of Commerce's ("Department" or "Commerce") results of its final remand redetermination in the eleventh administrative review of the antidumping duty ("ADD") order covering certain frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam") 2013-2014, 81 Fed. Reg. 17,435 (Dep't Commerce March 29, 2016), filed pursuant to the court's order in <u>Can Tho-Import Export Joint Stock Company v. United States</u>, Consol. Ct. No. 16-00071, Oct. 15, 2018, ECF No. 42 ("Order").  See Final Results of Redetermination Pursuant to Ct. Remand, Apr. 4, 2019, ECF No. 51 ("<u>Remand Results</u>").  On remand, Commerce elaborates on its decision to deny a separate rate to Can Tho Import-Export Joint Stock Company ("Plaintiff" or "Caseamex") in the eleventh administrative review.[1]  <u>See generally</u> <u>Remand Results</u> at 1–20.  Caseamex requests the court to again remand the case to Commerce to establish Caseamex's separate rate.  Pl.'s Cmts. on [Commerce's] Final Remand Redetermination at 2, June 7, 2019, ECF No. 61 ("Pl.'s Br.").  Defendant United States and Defendant-Intervenors request the court to affirm the <u>Remand Results</u>.  See Def.'s Resp. [Pl.'s Br.], July 12, 2019, ECF No. 67 ("Def.'s Br."); Def.-Intervenors' Resp. [Pl.'s Br.], July 12, 2019, ECF No. 64.  For the reasons that follow, Commerce's remand redetermination is unsupported by substantial evidence.

---

[1] Commerce, without confessing error, sought a remand in the eleventh administrative review, because it had denied Caseamex's separate rate application based on findings made in the tenth administrative review, which the court remanded in <u>An Giang Fisheries Import and Export Joint Stock Co. v. United States</u>, 41 CIT __, 203 F. Supp. 3d 1256 (2017) ("<u>An Giang I</u>").  See Joint Status Report & Br. Sched., Oct. 12, 2018, ECF No. 41.  On October 15, 2018, the court granted Defendant's request to reconsider Caseamex's separate rate status.  <u>See</u> Order.

Court No. 16-00071                                                                                  Page 3
**PUBLIC VERSION**

## BACKGROUND

Caseamex submitted a separate rate application in the eleventh administrative review. See Certain Frozen Fish Fillets from [Vietnam]: Issues and Decision Memo. for the Final Results of the Eleventh [ADD] Administrative Review; 2013-2014 at 4, A-552-801, (Mar. 18, 2016), ECF No. 22–3 ("Final Decision Memo"); see also Resp. Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec. of Commerce Pertaining to Caseamex Separate Rate Application Pt. 1, CD 36, bar code 3244388-01 (Dec. 1, 2014) ("Caseamex's SRA Pt. 1").[2] The eleventh administrative review covers the period dating August 1, 2013 through July 31, 2014 ("eleventh POR"). See Final Decision Memo at 1.

On remand, Commerce found that the minority government shareholder[3] retained potential influence over the selection of management and Caseamex's day-to-day operations. See Remand Results at 7–20. As a result, Commerce concluded that Caseamex failed to demonstrate autonomy and, therefore, did not qualify for a separate rate. See generally id.

## JURISDICTION AND STANDARD OF REVIEW

The court continues to have jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii), and 28 U.S.C. § 1581(c)

---

[2] On June 20, 2016, Defendant filed on the docket the indices to the public and confidential administrative records of this review at ECF Nos. 22-4–5. Subsequently, on April 15, 2019, Defendant also filed indices to the public and confidential remand record at ECF Nos. 53-2–3. All further references to documents from the administrative records are identified by the numbers assigned by Commerce in these indices.

[3] The minority government shareholder is the [[ 
                       ]]. Caseamex's SRA Pt. 1 at 13.

(2012), which grant the court authority to review actions contesting the final determination in an administrative review of an ADD order.[4] The court will sustain Commerce's final determinations if they are supported by substantial evidence and are in accordance with law. See 19 U.S.C. § 1561a(b)(1)(B)(i).

## DISCUSSION

Plaintiff challenges Commerce's Remand Results as contrary to law and unsupported by substantial evidence.[5] See Pl.'s Br. at 1–4. Specifically, Plaintiff contends that Commerce erred by applying a legal standard that assesses potential control based upon facts occurring prior to the period of review. Id. at 2, 4–7. Further, Plaintiff argues that, using the proper legal standard, Commerce's determination is not reasonable given the record evidence. Id. at 2–4, 8–20. Defendant disagrees and requests the court to sustain the Remand Results in their entirety. See Def.'s Br. at 1. For the following reasons, the court finds that Commerce's determination in the Remand Results is unsupported by substantial evidence.

When Commerce investigates subject merchandise from a non-market economy ("NME"), such as Vietnam, Commerce presumes that the government controls export-

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[5] Caseamex challenges Commerce's Remand Results as both unsupported by substantial evidence and as contrary to law. See Pl.'s Br. at 1–5. Plaintiff bases its contrary to law arguments on the court's holding in An Giang II, which, in Plaintiff's reading, establishes, as a matter of law, that Commerce may not engage in retrospective analysis. Id. at 4–7. However, the court in An Giang II determined that Commerce did not meet the substantial evidence standard by relying on retrospective analysis; it did not hold that Commerce erred in law by examining evidence preceding the period of review. See An Giang Fisheries Import and Export Joint Stock Co. v. United States, 42 CIT __, 284 F. Supp. 3d 1350, 1361–64 (2018) ("An Giang II"). Therefore, the court will analyze Plaintiff's challenge as one of substantial evidence.

related decision-making of all companies operating within that NME.  Import Admin., [Commerce], Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving [NME] Countries, Policy Bulletin 05.1 at 1 (Apr. 5, 2005) ("Policy Bulletin 05.1") (citation omitted), available at http://enforcement.trade.gov/policy/bull05-1.pdf (last visited Oct. 11, 2019); see also Antidumping Methodologies in Proceedings Involving Non-Market Economy Countries: Surrogate Country Selection and Separate Rates, 72 Fed. Reg. 13,246, 13,247 (Dep't Commerce Mar. 21, 2007) (request for comment) (stating the Department's policy of presuming control for companies operating within NME countries); Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997) (approving Commerce's use of the presumption).  Commerce will assign those companies a single, NME-wide rate, unless the exporter requests a separate rate and demonstrates an absence of government control, both in law (de jure) and in fact (de facto).[6]  Policy Bulletin 05.1 at 1.

Commerce evaluates an exporter's eligibility for a separate rate by assessing the absence of de facto and de jure control.[7]  Policy Bulletin 05.1 at 2; see, e.g., Silicon

---

[6] Respondents seeking to rebut the presumption of government control submit a separate rate application.  Policy Bulletin 05.1 at 3–4.

[7] Commerce will examine the following factors to evaluate de facto control: "whether the export prices are set by, or subject to the approval of, a governmental authority;" "whether the respondent has authority to negotiate and sign contracts and other agreements;" "whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management;" and, "whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses." Policy Bulletin 05.1 at 2.  With respect to de jure control, Commerce considers three factors: "an absence of restrictive stipulations associated with an individual exporter's business and export licenses;" "any legislative enactments decentralizing control of companies;" and, "any other formal measures by the government decentralizing control of companies." Id.

Carbide from the People's Republic of China [PRC], 59 Fed. Reg. 22,585, 22,587 (Dep't Commerce May 2, 1994). As a matter of practice, Commerce considers government ownership share in assessing de facto control. Commerce views government majority ownership as actual control, regardless of whether that control is exercised. See, e.g., 1,1,1,2-Tetrafluoroethane from the [PRC]: Issues and Decision Memorandum for the Final Determination of Sales at Less than Fair Value [ADD] Investigation at 8, A-570-998 (Oct. 14, 2014), available at http://ia.ita.doc.gov/frn/summary/prc/2014-24903-1.pdf (last visited Oct. 11, 2019); Decision Memorandum for the Preliminary Determination of the [ADD] Investigation of Carbon and Certain Alloy Steel Wire Rod from the [PRC] at 7, A-570-012 (Aug. 29, 2014), available at http://ia.ita.doc.gov/frn/summary/prc/2014-21335-1.pdf ("Steel Wire Rod Decision Memo"); see also An Giang II, 284 F. Supp. 3d at 1359 ("Where a majority shareholder has potential control that control is, for all intents and purposes, actual control.").

In cases of minority government ownership, Commerce requires additional indicia of control prior to concluding that a respondent company cannot rebut the presumption of de facto control. See, e.g., 53-Foot Domestic Dry Containers from the [PRC]: Issues and Decision Memo. for the Final Determination of Sales at Less Than Fair Value at 48–50, A-570-014 (Apr. 10, 2014), available at https://enforcement.trade.gov/frn/summary/prc/2015-08903-1.pdf (last visited Oct. 11, 2019) ("Containers Decision Memo") (finding de facto control where two government-owned minority shareholders, together, made the government a controlling shareholder according to the respondent company's Articles of Association). Commerce considers

Court No. 16-00071 Page 7
**PUBLIC VERSION**

the totality of the circumstances for a given period of review and may draw reasonable inferences that the respondent company does not control its export activities. See Steel Wire Rod Decision Memo at 5; see also Containers Decision Memo at 46–53.

The court reviews the substantiality of the evidence "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)) (internal quotes omitted).

In the eleventh administrative review, Plaintiff submitted evidence to rebut the presumption of de facto governmental control, namely Caseamex's 2012 Articles of Association ("AoA") and five affidavits and a letter (collectively, "affidavits").[8] See Resp.

---

[8] The affidavits submitted by Caseamex address issues of management and operation. See Caseamex's Supp. Resp. at Exs. S-1, S2-1–3, S3-4, S3-9. Commerce considered all six to be "unpersuasive[.]" Remand Results at 19–20, 36. Collectively, the affidavits assert that: the local government does not control or monitor Caseamex; its shares are represented by Mr. X; and, it is not involved in the selection of management or pricing. Caseamex's Supp. Resp. at Exs. S-1, S2-1–3, S3-4, S3-9. Further, Mr. X, in two affidavits, attests that he is not involved with the minority government shareholder. See id. at Exs. S2-2, S3-9. Commerce found that the affidavits were almost all [[                                                        ]] and questioned their credibility. See Remand Results at 16–20, 28–46. Commerce faulted two affidavits for failing to address pre-POR events, "where [the minority government shareholder] selected Caseamex's managers[,]" and rejected them, in part, on that basis. Id. at 19. Commerce found, moreover, that none "contain[] . . . affirmative statements . . . that confirm the Vietnamese government separated itself from the operations of Caseamex[.]" Id. According to Plaintiff, this finding amounts to "pure tautology – based on a negative inference[,]" when, in fact, the affidavits demonstrate that the

(footnote continued)

Grunfeld Desiderio Lebowitz Silverman Kledstadt, LLP to Sec. of Commerce Pertaining to Caseamex Separate Rate Application Pt. 2 at Ex. 10, CD 34, bar code 3244388-02 (Dec. 1, 2014) ("Caseamex's SRA Pt. 2"); see also Caseamex's Supp. Resp. at Exs. S-1, S2-1–3, S3-4, S3-9, RCD 4, bar code 3782005-03 (Feb. 19, 2014) ("Caseamex's Supp. Resp."). Even without the affidavits, the AoA rebuts the presumption of government control, and Commerce points to no record evidence that reasonably supports its view that the minority government shareholder retained control.

The AoA restricts a minority shareholder's control over the appointment of Caseamex's directors and management.[9] Shareholders with more than [[ ]] of shares may nominate candidates to the Board of Directors and Board of Managers;[10] however, the AoA limits the number of candidates a shareholder, or group of shareholders, may nominate to the Board of Managers in proportion to shares held.[11] See Caseamex's SRA Pt. 2 at Ex. 10. Further, an individual minority shareholder may have sufficient shares to nominate a candidate or candidates but will be unable to approve the nominee(s) alone.

---

minority government shareholder had relinquished its shareholder rights and any ability to control Caseamex. Pl.'s Br. at 29. Nonetheless, Commerce did not credit these affidavits and the court will not "reweigh Commerce's findings" regarding these inferences to be drawn from these affidavits. See Downhole Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1379 (Fed. Cir. 2015); see also Timken Co. v. United States, 22 CIT 955, 962, 699 F. Supp. 300, 306 (1988) ("It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of differing interpretation of the record."); An Giang I, 203 F. Supp. 3d at 1280 n.37.

[9] The AoA came into effect prior to October 2012 and remained in effect throughout the eleventh POR. Caseamex's SRA Pt. 2 at Ex. 10.

[10] See Caseamex's SRA Pt. 2 at Ex. 10 (Articles 12.3 and 12.5).

[11] For example, fewer than [[ ]] of shares—but greater than [[ ]]— translates into the nomination of [[ ]] member, and between [[ ]] and [[ ]] of shares furnishes [[ ]] nominations. See Caseamex's SRA Pt. 2 at Ex. 10 (Article 25).

The AoA requires 65% approval by vote for any appointment to either the Board of Managers or the Board of Directors.[12] Thus, Commerce's arguments that the AoA support its view that the minority government shareholder retained potential control over Caseamex during the eleventh POR are unavailing.

Although Commerce reasonably concludes that Caseamex employees were beholden to Mr. X[13] throughout the eleventh POR, that conclusion detracts from, rather than supports, Commerce's conclusion regarding government control. Having established Mr. X was the General Director, Chairman of the Board, and controller of Caseamex's daily operations, Commerce concluded that his power over Caseamex employees—to hire, pay, and fire—made them beholden to him. Remand Results at 13. Commerce concluded it would be unlikely for the employees to exercise any minority rights inconsistent with Mr. X's wishes. Mr. X therefore could count his own shares and on those of Caseamex employees. Commerce reasons that because Mr. X and his employees held [[     ]] of voting shares, and the minority government shareholder owned [[     ]], together, with [[     ]] of shares, they would prevent other shareholder(s) from reaching the 65% threshold to approve managers and directors. Remand Results at 12, 15; see Caseamex's SRA Pt. 2 at Ex. 11. However, Mr. X and his employees

---

[12] In its Separate Rate Application, Caseamex confirms that "[n]o material changes in company structure, shareholdings or operations have occurred since [the ninth period of review] or [the tenth period of review.]" See Remand Results at 2 (citing Caseamex's SRA Pt. 1 at 2). Throughout the eleventh POR, the largest shareholders of Caseamex comprised: Mr. X with [[     ]], the minority government shareholder with [[     ]], and Caseamex employees with [[     ]]. See Remand Results at 12; see also Caseamex SRA Pt. 1 at Ex. 4 (listing Caseamex's shareholders in business registration certificates preceding and following the eleventh POR ).

[13] Mr. X refers to [[                    ]]. See Remand Results at 8; see also Caseamex SRA Pt. 1 at Ex. 1.

Court No. 16-00071	Page 10
**PUBLIC VERSION**

could block an appointment with or without the minority government shareholder's assistance. Commerce points to no record evidence that obliges Mr. X to follow the minority government shareholder's voting prerogatives during the eleventh POR. See An Giang II, 284 F. Supp. 3d at 1361. Rather, Commerce assumes that Mr. X will vote with the minority government shareholder and direct his employees to do so, because Mr. X remains beholden to the minority government shareholder that initially appointed him the General Director of Caseamex.[14] See Remand Results at 13. Yet the record evidence establishes that a minority shareholder has no power to effectuate change in the company. Indeed, given the share allocations, the AoA renders the minority government shareholder beholden to Mr. X's voting prerogatives, to exert influence in the company.[15]

---

[14] Commerce's position here regarding the hiring of Mr. X is similar to its claim in An Giang II, where Commerce unreasonably relied on evidence preceding the period of review, or "retrospective" evidence of control prior to the period of review. 284 F. Supp. 3d at 1361. In the tenth administrative review of the same ADD order at issue here, Commerce based its denial of Caseamex's separate rate status based on a two-component "beholden" theory, "one retrospective (i.e., the government hired Mr. X) . . . and the other prospective (i.e., the government could fire Mr. X)[,]" both rendering Mr. X beholden to the government and susceptible to its control. Id. at 1361. Although the minority government shareholder may have hired Mr. X at the inception of Caseamex, the court noted that event in itself "do[es] not demonstrate how the minority government shareholder was able to influence Mr. X's decision-making as to the day-to-day operations of CASEAMEX or the selection of CASEAMEX's management during the [tenth period of review]." Id. Further, to the extent Commerce "suggest[ed] that past employees may feel grateful to their past employers[,]" Commerce did not explain "why that gratitude translates into a lack of independence where a past government employer no longer has the power to dismiss the employee." Id. at 1361 n.17. The court therefore concluded that Commerce's reliance on such "retrospective" evidence was unreasonable. Id. at 1361. Nonetheless, the court sustained Commerce's determination because Commerce reasonably found prospective control. Id. at 1364.

[15] Commerce also addresses Caseamex's claim that the minority government shareholder. divested its shares and forfeited its shareholder rights and responsibilities. See Remand Results

(footnote continued)

Court No. 16-00071  Page 11
**PUBLIC VERSION**

      Commerce's finding that Mr. X was beholden to the minority government shareholder stems from its survey of events before the period of review. Commerce purports to examine the totality of the circumstances that support its finding that a potential for governmental control existed during the eleventh POR. See Remand Results at 10–13. Yet it catalogues a series of events, from 2005 to 2012, that precede the eleventh POR, namely: the formation of Caseamex from a state-owned enterprise; the minority government shareholder's appointment of Mr. X as the director of that state-owned enterprise and then of Caseamex; and, the minority government shareholder's appointment of the Board of Directors and the Board of Managers. Remand Results at 7–12. Commerce does not explain how these past factual circumstances—Mr. X's employment history and the creation of the first Board of Directors and selection of managers—support the inference of the minority government shareholder's control over the operation of Caseamex during the eleventh POR. See An Giang II, 284 F. Supp. 3d at 1361 n.17. Commerce determined that the minority government shareholder had not removed itself from the operations of the company, and, as a result, Mr. X remained beholden to the minority government shareholder—as he had been from the inception of the company. Id. at 14. Commerce offers no explanation why it is reasonable to conclude that Mr. X, was beholden to the government, when the AoA precludes the minority

---

at 32–36, 41–44. Commerce claims that none of the cited provisions of the AoA "addresses one party appointing an authorized representative of its shares at the General Meeting." Id. at 33. Commerce therefore concludes that the minority government shareholder did not abdicate its shares. Id. at 36. Even if Commerce's conclusion is reasonable, it does not detract from the evidence showing that the AoA curtails minority government shareholder rights.

government shareholder from exercising any independent influence on the Board of Directors or any manager of Caseamex, including Mr. X.  Although Caseamex has the burden of rebutting governmental control, it has rebutted that presumption here.  Commerce's attempt to look backwards from the eleventh POR to a time when the minority government shareholder had the power to control the company in order to infer continued control in the eleventh POR is not reasonable.  Nothing in the record supports Commerce's view that the minority government shareholder could circumvent the restrictions and limitations imposed by the AoA.  Rather, record evidence suggests that Mr. X could count on his own shares and those of the Caseamex employees to operate jointly and even counter to the minority government shareholder.

## CONCLUSION

The court remands Commerce's determination not to grant Caseamex separate rate status in the <u>Remand Results</u> for further consideration and explanation. In accordance with the foregoing, it is

**ORDERED** that Commerce's determination not to grant Caseamex separate rate status is remanded for further consideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within 60 days of this date; and it is further

**ORDERED** that Plaintiff shall have 30 days thereafter to file comments; and it is further

Court No. 16-00071                                                                 Page 13
**PUBLIC VERSION**

**ORDERED** that Defendant and Defendant-Intervenors shall have 15 days thereafter to file their replies to comments on the remand determination.

                                                                  /s/ Claire R. Kelly
                                                                 Claire R. Kelly, Judge

Dated: October 17, 2019
       New York, New York